UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) | |
| *Plaintiff*, | ) ) | No. 1:17-cv-00712-JMS-MPB |
| *vs.* | ) ) | |
| KIZZANG LLC and ROBERT ALEXANDER, | ) ) ) | |
| *Defendants*. | ) | |

## ORDER

In March 2017, Plaintiff National Collegiate Athletic Association (the "NCAA") initiated this lawsuit against Defendants Kizzang LLC ("Kizzang") and Robert Alexander, the founder and owner of Kizzang, for trademark infringement, trademark dilution, and unfair competition related to Defendants' alleged use of the marks "FINAL 3" and "APRIL MADNESS." On November 7, 2017, the Court denied Defendants' Motion to Dismiss and granted the NCAA's Request for Entry of Default based on Defendants' failure to timely answer or otherwise plead to the Complaint. [Filing No. 73.] Then, on January 18, 2018, the Court granted the NCAA's Motion for Default Judgment and Motion for Permanent Injunction. [Filing No. 87.] In its January 18, 2018 Order, the Court found that this is an "exceptional case" which entitles the NCAA to an award of its attorneys' fees, and set a schedule related to any fee motion the NCAA should file. [Filing No. 87.] The NCAA has filed its Motion for Attorneys' Fees, [Filing No. 93], which is now ripe for the Court's decision.

# I.
## Background[1]

On March 8, 2017, the NCAA filed its Complaint in which it alleged that Defendants "are in the business of marketing and providing nationwide Internet-based promotions that award prizes for predicting the results of sporting events, including the results of college basketball games played by and between NCAA member schools, and in particular games played during the NCAA's Division I Men's Basketball Championship." [Filing No. 1 at 5.] It alleged that Defendants used the marks FINAL 3 and APRIL MADNESS in connection with their Final Four-based contests and "continue offering goods and services using the FINAL 3 and APRIL MADNESS marks via webpages and mobile-telephone applications...." [Filing No. 1 at 6-7.] The NCAA alleged that Kizzang has applied for federal trademark registration for FINAL 3 and APRIL MADNESS with the United States Patent and Trademark Office ("USPTO"). [Filing No. 1 at 7.]

The NCAA set forth claims for: (1) trademark infringement under 15 U.S.C. § 1114; (2) trademark infringement under 15 U.S.C. § 1125(a); (3) trademark dilution under 15 U.S.C. § 1125; and (4) unfair competition. [Filing No. 1 at 8-11.] The NCAA filed a Motion for Preliminary Injunction on March 9, 2017, requesting that the Court preliminarily enjoin Defendants from the acts set forth in the request for relief contained in the Complaint. [Filing No. 5.] Seven days later, the Court entered a Stipulated Order, submitted on a motion by all parties, ordering that: (1) "[n]either Kizzang or Alexander, nor any of their officers, agents, servants, employees or attorneys, or anyone acting in concert with any of them, will use the marks FINAL 3 (or THREE) or APRIL MADNESS or any similar marks, in connection with any basketball themed contest, promotion or service in 2017"; (2) the NCAA's Motion for Preliminary Injunction is withdrawn

---

[1] The background facts are taken largely from the Court's November 7, 2017 and January 18, 2018 Orders. [Filing No. 73; Filing No. 87.]

without prejudice; and (3) "Defendants, having been served with the Complaint, shall answer by June 15, 2017." [Filing No. 20.] The June 15, 2017 answer deadline was later extended to July 15, 2017. [Filing No. 28.]

The July 15, 2017 deadline came and went without an answer or pleading from Defendants, and on July 21, 2017, the NCAA filed its Request for Entry of Default. [Filing No. 30.] Defendants responded to the Request for Entry of Default on August 10, 2017, [Filing No. 36], and filed a Motion to Dismiss or, in the alternative, to transfer the case to the United States District Court for the District of Nevada on August 31, 2017 – more than six weeks after the July 15, 2017 responsive pleading deadline, [Filing No. 50; Filing No. 51].

On November 7, 2017, the Court denied Defendants' Motion to Dismiss as to Defendants' personal jurisdiction argument, denied as moot the remainder of the Motion to Dismiss, and granted the NCAA's Request for Entry of Default. [Filing No. 73.] Shortly thereafter, the NCAA filed a Motion for Default Judgment, [Filing No. 76], and a Motion for Preliminary Injunction, [Filing No. 78]. The Court granted both motions on January 18, 2018, and specifically found that the circumstances present made this an "exceptional case" such that the NCAA is entitled to attorneys' fees under the Lanham Act. [Filing No. 87 at 18-19.] The NCAA then filed a Motion for Attorneys' Fees. [Filing No. 93.]

## II.
### STANDARD OF REVIEW

The Lanham Act provides for the recovery of attorneys' fees in "exceptional cases." 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party"). The Court has already found that this case is an "exceptional" one, entitling the NCAA to attorneys' fees. [Filing No. 87 at 18-19.] District courts have wide discretion when awarding attorneys' fees under the Lanham Act. *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d

1045, 1048 (7th Cir. 2016) (appellate court's review of district court's award of attorneys' fees is "'highly deferential' because the district court is in the best position to determine the reasonableness of an award for work done on litigation in that court") (quoting *Montanez v. Simon*, 755 F.3d 547, 552-53 (7th Cir. 2014)); *S Industries, Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir. 2001) ("Under the Lanham Act, an award of attorneys fees is committed to the trial court's sound discretion," and on appeal, the court of appeals "review[s] a grant of attorney fees to a prevailing defendant under the Lanham Act only for clear error").

The Court "begins the fee calculation by computing a 'lodestar': the product of the hours reasonably expended on the case multiplied by a reasonable hourly rate." *Montanez*, 755 F.3d at 553. The lodestar calculation produces a "presumptively reasonable fee," which may be adjusted based on factors not accounted for by the award calculation. *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). The movant bears the burden of proving that the requested hourly rate is reasonable and "'in line with those prevailing in the community.'" *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 640 (7th Cir. 2011) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). The best evidence is "the amount the attorney actually bills for similar work." *Montanez*, 755 F.3d at 553 (internal quotation omitted). A movant may also prove the reasonableness of a requested rate with, for example, evidence of attorneys' fee awards in previous cases and evidence of the rates of similarly experienced attorneys performing similar work. *Id.* Not all evidence should be treated equally, however. Courts may properly discount "conclusory affidavits from attorneys merely opining on the reasonableness of another attorney's fee," evidence "involv[ing] different markets," and prior awards "based on compromises between parties." *Id.* (internal alterations and quotations omitted). Moreover, "'while evidence of fee awards in prior similar cases must be considered by a district court as evidence of an attorney's market rate, such evidence

4

is not the *sine qua non* of that attorney's market rate – for each case may present its own special set of circumstances and problems.'" *Pickett*, 664 F.3d at 646 (quoting *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 408 (7th Cir. 1999)). Thus, while the Court may not ignore fee awards from other cases, the Court is not bound by such determinations, *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 557 (7th Cir. 1999), particularly where a fee award lacks an "explanation as to how the court[ ] had arrived at [particular] rates." *Pickett*, 664 F.3d at 643 n.4.

Should the plaintiff establish that the requested rates are within the prevailing community rate, the burden shifts to the defendant to demonstrate "a good reason why a lower rate is essential." *Id.* at 640 (internal quotation omitted). A defendant must offer at least some evidence to rebut a plaintiff's showing of a reasonable hourly rate, and may do so by pointing to market data, lower prior awards for the plaintiff's attorney, and past awards for other comparable attorneys in the market. *Id.* at 647. If the plaintiff does not meet the burden of proving that the requested rates are appropriate, the Court may independently determine an appropriate rate. *Montanez*, 755 F.3d at 553.

"The Supreme Court has consistently held that the interest in uniformity of fee awards is not great enough to justify closer appellate scrutiny – indeed, the Court has said that there is hardly any 'sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.'" *Id.* (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). "[T]rial courts need not, and indeed should not, become green-eyeshade accountants." *Fox*, 563 U.S. at 838. Rather, "[t]he essential goal…is to do rough justice" and to avoid allowing the fee determination to "result in a second major litigation." *Id.* (internal quotation omitted).

**III.**
**DISCUSSION**

In support of its Motion for Attorneys' Fees, the NCAA argues that it has incurred $242,213.55 in attorneys' fees, and that those fees are reasonable in light of the history of this case. [Filing No. 94 at 2-4.][2] The NCAA argues that each attorney that worked on the case expended a reasonable amount of time, and that their rates were reasonable. [Filing No. 94 at 5-8.] It also notes that some of the attorneys have been representing the NCAA as litigation counsel for many years, and have "developed efficiencies in [their] practice due to [their] familiarity with the NCAA's intellectual property rights, as well as [their] relationships with the NCAA's in-house counsel and other key personnel." [Filing No. 94 at 6.] The NCAA contends that local counsel and several paralegals spent a reasonable amount of time on this case, and that their rates are reasonable. [Filing No. 94 at 7-8.] Finally, the NCAA notes that, although the litigation ended with a default judgment, it involved "preparing two motions for preliminary injunction (both solely due to Defendants' intent to infringe on the NCAA's intellectual property rights), a motion for entry of default, a motion for entry of default judgment, and a motion for permanent injunction. The NCAA also had to oppose (successfully) Defendants' motion to dismiss and motion for evidentiary hearing, both of which were needlessly filed after entry of default." [Filing No. 94 at 8.]

In their response, Defendants argue that the attorneys' fees the NCAA seeks are unreasonable. First, they argue that the NCAA provided an estimate of its attorneys' fees for settlement purposes in January 2018 of $195,000, and that "23 days later,…the total amount of the

---

[2] The NCAA is not seeking attorneys' fees in connection with preparing the Motion for Attorneys' Fees. [Filing No. 94 at 2 (the amount requested "includes a discount insofar as the amount does not include the fees and costs incurred in preparing this Motion for Attorneys' Fees").]

NCAA's fee request increased by nearly 25%, to $242,213.55…." [Filing No. 98 at 6-7.] Second, Defendants assert that the NCAA's counsel's invoices reflect duplicative, excessive, and/or unnecessary time entries, including: (1) work on the NCAA's opposition to Defendants' Motion to Dismiss; (2) excessive time spent on research; (3) vague time entries; (4) preparation of never-filed motions for default judgment and a second motion for preliminary injunction; (5) time spent communicating between professionals; (6) time reflecting one attorney or paralegal's review of another attorney or paralegal's work; and (7) time reflecting administrative and/or secretarial work. [Filing No. 98 at 7-12.] Third, Defendants contend that the NCAA's fee request is "improperly based on higher rates from distant markets." [Filing No. 98 at 13-15.] Defendants request that the NCAA's Motion for Attorneys' Fees be denied in its entirety or, in the alternative, that it be reduced by $47,213.55 (the difference between the amount requested and the amount provided as an estimate in January 2018); that all administrative and secretarial tasks be removed from the bill; that all time spent on briefs that were never filed be stricken; that a negotiated rate of $234/hour be applied to all counsel; that all time spent between communicating professionals be reduced by 75%; and that "the remaining amount be reduced by at least 50% to reflect duplicative and excessive time." [Filing No. 98 at 16.]

In its reply, the NCAA argues that the attorneys' rates represent the actual market rate for each attorney, and that the Court should "conclude that counsel's decisions on how to spend time litigating a matter were reasonable in the absence of particularized evidence to the contrary." [Filing No. 99 at 5.] The NCAA also contends that the amount of time spent is reasonable if the client paid for them, and that it has paid the invoices. [Filing No. 99 at 5.] The NCAA argues further that it should not be penalized for using its longtime counsel to continue litigating against Kizzang, and that the attorneys' hourly rates should not be adjusted to reflect the Indianapolis

market.  [Filing No. 99 at 6-7.]  The NCAA asserts that many of the tasks that Defendants object to were necessitated by Defendants' litigation tactics – including filing a Motion to Dismiss while the NCAA's Motion for Clerk's Entry of Default was pending.  [Filing No. 99 at 8-9.]  It notes that Defendants' Motion to Dismiss involved many different issues which required legal research, and that the only unfiled motion for which the NCAA seeks fees is the NCAA's second Motion for Preliminary Injunction, which had to be prepared because Defendants would not agree to extend the stipulated preliminary injunction.  [Filing No. 99 at 10.]  Finally, the NCAA argues that the estimate of attorneys' fees it provided in January 2018 is not binding.  [Filing No. 99 at 11.]

The Court will address in turn the three main issues that Defendants raise in connection with the NCAA's Motion for Attorneys' Fees – the discrepancy between estimated fees and actual fees sought; the amount of hours spent (and the contentions that work was duplicative, excessive, and/or unnecessary); and the hourly billable rates.  The Court notes at the outset that Defendants do not contest the time spent by the NCAA's local counsel, Faegre Baker Daniels LLP ("Faegre"), focusing only on time spent by attorneys and paralegals at Loeb & Loeb LLP ("Loeb") and on the hourly rates of attorneys and paralegals at Loeb and, to some extent, Faegre.  The Court will consider Defendants' arguments accordingly.

### A.  Discrepancy Between Fee Estimate and Fees Ultimately Sought

Defendants point to emails between their counsel and the NCAA's counsel in January 2018 which related to the possibility of settling the attorneys' fee issue.  The string of emails began with Defendants' counsel stating "just so I am clear, what is the exact amount of attorneys' fees that NCAA plans to claim for reimbursement?  Also, please send us your itemized bills reflecting the total so that we can use that information to have a substantive discussion with our client before the next conference with the court on 2/2."  [Filing No. 98-1 at 4.]  Counsel for the NCAA responded:

> [W]e are not going to send the bills before you are able to report back to the Court the extent of your client's willingness to entertain a stipulation of a substantial amount of attorneys' fees. We understand that the stipulated amount [would] be subject to review of rates and hours, but the Court was clear that before undertaking the process of such review Defendants need to express their position on our proposal to seek such a stipulation in lieu of a motion. Based on prior positions your clients have taken, we are skeptical that such a negotiation would be productive and are disinclined to do it without some assurance to the contrary.

[Filing No. 98-1 at 3-4.]

Defendants' counsel responded that they could not "even meaningfully consider a stipulation unless we know the total amount of attorneys' fees, as well as the corresponding number of hours and your rates. Are you going to provide those figures? It not, then what, exactly, are you asking our clients to stipulate to?" [Filing No. 98-1 at 3.] Counsel for the NCAA responded "I mentioned the amount on the call – about $195,000. If you can't meaningfully consider the stipulation under the circumstances that probably tells us what we need to know. You can meaningfully consider a stipulation with the caveat that you will have the opportunity to consider the rates and hours." [Filing No. 98-1 at 3.]

The email exchange indicates that counsel for the NCAA wanted Defendants' counsel to "entertain a stipulation" in lieu of the NCAA filing a motion for attorneys' fees, and that an agreement to attempt to reach a stipulation could not be reached because counsel for Defendants wanted to see invoices and counsel for the NCAA was not yet willing to provide that information. The $195,000 figure appears to have been an estimate, and Defendants have not cited to any legal authority suggesting that providing an estimate of attorneys' fees would limit the NCAA to seeking only that amount through its Motion for Attorneys' Fees. The Court finds this estimate insignificant and irrelevant in terms of determining what part of the fees actually billed are recoverable by the NCAA. The Court declines to reduce, up front, the amount of fees the NCAA seeks through its motion by the difference between that amount and the $195,000 estimate.

**B. Number of Hours Spent**

The Court will consider the seven main areas where Defendants argue the NCAA's counsel – specifically, Loeb – spent an unreasonable amount of time on certain tasks. In considering Defendants' arguments, the Court first sets forth each Loeb timekeeper and the amount of hours they have spent on this litigation.

| TIMEKEEPER | HOURS SPENT |
| --- | --- |
| Douglas Masters (Partner) | 98.0 |
| Edward Lee (Senior Associate) | 139.7 |
| Crystal Law (Associate) | 47.9 |
| Kyle Petersen (Associate) | 50.4 |
| Lisa Rubin (Associate) | 65.9 |
| Sarah Kunzendorf (Paralegal) | 11.8 |
| Linda Pettigrew (Paralegal) | 33.2 |
| Barbara Fellars (Paralegal) | 1.1 |

In reviewing the time the NCAA's attorneys and paralegals spent working on this case, and the types of tasks they performed, the Court keeps in mind the United States Supreme Court's admonition that "trial courts need not, and indeed should not, become green-eyeshade accountants." *Fox*, 563 U.S. at 838.

*1. Opposition to Defendants' Motion to Dismiss*

Defendants argue that the attorneys and paralegals for the NCAA spent fifty hours total in responding to Defendants' Motion to Dismiss, and that "[t]he time spent by five attorneys and one

paralegal to review a 20-page brief filed by Defendants…and prepare a 14-page response…was clearly duplicative, excessive, and/or unnecessary, and must be reduced by at least 50%." [Filing No. 98 at 9.] They also complain regarding time spent by Mr. Masters "attending to" and "reviewing" the response to the Motion to Dismiss, because the time entries "do not reflect any editing or any level of collaboration with the other four attorneys and one paralegal who also logged time relating to the NCAA's response to Defendants' motion to dismiss." [Filing No. 98 at 9.] Defendants request that all duplicative time entries be stricken.

The NCAA argues that Defendants' counsel "sell themselves short," and that the Motion to Dismiss was complex and required research into several issues. [Filing No. 99 at 9-10.] It contends that Mr. Masters' use of the phrase "attending to" in his time entries "is analogous to 'strategizing' or 'considering a response.'" [Filing No. 99 at 9.]

Defendants do not identify for the Court any of the specific time entries that they believe are duplicative or excessive, only arguing that fifty hours was too much to spend on responding to the Motion to Dismiss and that the time should "be reduced by at least 50%." [Filing No. 98 at 9.] Nor do Defendants point to any caselaw to support their request. The Court does not find fifty hours to be an excessive amount of time spent responding to Defendants' Motion to Dismiss. The Motion to Dismiss was filed at a procedurally inappropriate time, after the NCAA's Motion for Clerk's Entry of Default had been fully briefed, but before the Court had issued a ruling. Further, the Motion to Dismiss, supported by a twenty-page brief, raised numerous issues, including: (1) whether the Court had personal jurisdiction over Defendants; (2) whether the NCAA's claims against Mr. Alexander should be dismissed for improper venue; (3) whether the NCAA stated a claim against Mr. Alexander under Fed. R. Civ. P. 12(b)(6); and (4) whether, if the case was not dismissed, it should be transferred to the District of Nevada. [Filing No. 51.] The Court finds that

Defendants have not met their burden of demonstrating that the fifty hours spent planning, researching, and drafting a response to the Motion to Dismiss was unreasonable – simply saying that fifty hours was too much does not make it so. Additionally, the Court does not find problematic Mr. Masters' use of the phrase "attending to" or "reviewing" in connection with the Motion to Dismiss. The Court finds the time expended by the NCAA's counsel in connection with opposing Defendants' Motion to Dismiss to be reasonable.

### 2. *Time Spent on Research*

Defendants argue that three associates spent "dozens of hours researching Seventh Circuit law on default judgment and personal jurisdiction," a senior associate researched default judgment, and "[t]hese are hardly novel issues and do not warrant dozens of hours of time in research and discussion by four attorneys." [Filing No. 98 at 9.] Defendants request that the amount of time "spent by two or more counsel researching the same topic should be reduced at least by 50%." [Filing No. 98 at 9.]

The NCAA notes that they needed to research several issues, including personal jurisdiction, and that these issues were dispositive. [Filing No. 99 at 9-10.]

Again, Defendants have not pointed to specific time entries, or even the amount of time that they contest, related to researching default judgment and personal jurisdiction issues, only arguing that it was "dozens of hours." [Filing No. 98 at 9.] Not even setting forth how much time was spent, yet requesting that the amount of time be reduced by 50%, leaves the work to the Court to review the invoices and make the calculations, assuming a reduction is justified. Defendants have not met their burden of demonstrating that time spent researching various issues was excessive. *See Hutchison v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1048 (7th Cir. 1994) ("Counsel who oppose fees have a 'responsibility to state objections with particularity and

clarity'") (quoting *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 664 (7th Cir. 1985)).

The Court declines to reduce the NCAA's fee request based on Defendants' argument that its

counsel spent excessive time on research.

### 3. Vagueness of Time Entries

Defendants request that Mr. Masters' entries reflecting that he "attended" to a particular

matter should be stricken because "[a]pparently he was not reviewing, revising, or discussing,

because when he did those things, he noted those tasks specifically as such in his time entries."

[Filing No. 98 at 10.]  The NCAA argues that "attending" to issues is analogous to "strategizing"

or "considering a response."  [Filing No. 99 at 9.]

As discussed above, the Court does not find an issue *per se* with using the phrase "attending

to."  It also does not find compelling Defendants' argument that because Mr. Masters specified

whether he was reviewing, revising, or discussing issues in other time entries, the entries where he

used "attending to" must be duplicative.  And again, Defendants have not met their burden of

demonstrating that the time Mr. Masters spent was duplicative because they have not pointed to

any specific entries that should be stricken.  The Court rejects Defendants' argument that "vague"

time entries should be stricken, as – ironically – they have not identified with specificity what

those entries are.

### 4. Never-Filed Motions

Defendants contend that the NCAA began preparing a motion for entry of default judgment

and a second motion for permanent injunction around the end of November 2017, and that those

motions were never filed, so all time spent preparing them should be stricken.  [Filing No. 98 at

10-11.]  They argue that "[t]he NCAA's counsel spent at least 15 additional hours researching

default judgment (again), and preparing motions or briefs that it ultimately never filed.  The time

entries indicate Mr. Lee spent over 12 hours on the contemplated brief(s), and Mr. Masters spent over 4 hours…. [T]he fees associated with Mr. Lee's and Mr. Master's (sic) work, as well as any other counsel or paralegals, on the unfiled motions and/or briefs are at least $10,000." [Filing No. 98 at 10-11.]

The NCAA argues that Defendants have misread their time entries, and that the time entries related to the so-called second motion for entry of default judgment and second motion for permanent injunction were actually for time spent drafting reply briefs in support of those motions. [Filing No. 99 at 10.] It also contends that the only unfiled motion for which the NCAA seeks fees was the second motion for preliminary injunction, which "had to be prepared because Defendants would not agree to extend the stipulated preliminary injunction…, and as a result, the NCAA was forced to prepare a second motion to protect its rights." [Filing No. 99 at 10.]

The Court agrees that the November 2017 time entries related to the motion for entry of default judgment and the motion for permanent injunction were not to prepare unfiled motions, but rather related to preparing the NCAA's reply briefs in support of those motions. The reply briefs were both filed on December 1, 2017, [Filing No. 85; Filing No. 86], and it makes sense that work spent preparing the reply briefs would have been done in late November. The Court declines Defendants' request to strike those entries. And to the extent Defendants challenge time spent preparing a second motion for preliminary injunction, the Court declines to strike entries related to that task as well. By all accounts, Defendants would not agree to an extension of the stipulated preliminary injunction, so the NCAA was preparing to file a second motion in order to protect its trademarks – particularly as the NCAA's Division I Men's Basketball Championship approached in March. The need to prepare a second motion for preliminary injunction was due to Defendants' own conduct – specifically, their unwillingness to keep the status quo until the Court ruled on the

NCAA's Motion for Default Judgment and Motion for Permanent Injunction. The Court finds that spending time preparing a second motion for preliminary injunction was reasonable.

### 5. *Communication Between Professionals*

Defendants next argue that time spent communicating between and among attorneys and paralegals was unreasonable because "[b]ased upon the unreasonable volume of the 15 professionals who did spend time on the case, the time spent communicating with one another was much greater than, say, if 3 attorneys and 1 paralegal had worked on the case, with 1 attorney as local counsel." [Filing No. 98 at 11.] Defendants request that the time spent communicating between professionals be reduced by 75%. [Filing No. 98 at 11.]

The NCAA argues that the time entries "reflect the efficient and practical arrangement of having the majority of drafting, strategizing, and planning performed by a senior associate…under the supervision of a senior partner…, with research on different topics performed by various junior associates with far lower billing rates. This arrangement necessitates communication between attorneys, but such internal communications are not wasteful *per se*, and Defendants have no grounds for arguing that communications between attorneys are unreasonable." [Filing No. 99 at 8.]

Defendants' argument regarding communications between professionals amounts to three sentences. [Filing No. 98 at 11.] They do not point to any specific entries, do not set forth the specific amount of time they are objecting to, and do not set forth any explanation for why the time spent "communicating between professionals" should be reduced by 75%. The Court recognizes that a certain amount of communication between and among attorneys and paralegals is necessary for the efficient staffing of a case. The Court also recognizes that when a specific claim of duplication is made and supported by reference to specific entries, a reduction might be proper.

But here Defendants have not met their burden of demonstrating why, in this case, such collaboration was unreasonable. The Court rejects Defendants' request to reduce "time spent communicating between professionals" by 75%.

### 6. Review of Work

Defendants also request that the Court "reduce[ ] accordingly" hours spent "reviewing briefs and reviewing one another's work," because "work that could have been done by one or two attorneys was instead done by three or four attorneys, plus two or three paralegals." [Filing No. 98 at 11.]

The NCAA argues that counsel staffed the case efficiently, and that this type of arrangement requires a certain amount of communication between attorneys. [Filing No. 99 at 8.]

The Court finds Defendants' argument regarding attorneys and paralegals reviewing other's work unavailing. First, collaboration among attorneys and paralegals is commonplace, especially when more junior attorneys or paralegals are performing work in collaboration with senior attorneys. Second, as with many of Defendants' arguments, Defendants have not come close to meeting their burden of establishing that time spent reviewing the work of other attorneys or paralegals was unreasonable. Defendants' argument comprises two sentences of their response brief, with no examples from invoices, no tally of the time spent doing this type of work, and no specific amount by which Defendants argue the time should be reduced. The Court rejects Defendants' argument related to reviewing the work of other attorneys or paralegals.

### 7. Administrative and/or Secretarial Work

Defendants argue that paralegal Sarah Kunzendorf "charged for time to upload pleadings, prepare file and index of same, update pleadings index, review and update docket, [and] prepare screen shots of websites for exhibits." [Filing No. 98 at 11.] They challenge Ms. Kunzendorf's

hourly rate of $270, and request that "[a]ny time spent by any…attorneys or paralegals in this case on secretarial or administrative tasks should be stricken." [Filing No. 98 at 11.] Defendants point to a case where the court found that 74.4 hours for attorney services and 40.4 hours for legal assistant services was reasonable, and argue that the NCAA expended more than double that amount of time in this case. [Filing No. 98 at 12.] Defendants also cite a case from this district where the court found that $270,000 in attorneys' fees was reasonable in a "hotly contested litigation" that lasted almost three years. [Filing No. 98 at 12.]

The NCAA argues generally that counsel's decisions regarding how to litigate a case should be found reasonable in the absence of evidence to the contrary, and that "[t]here is no dispute that the NCAA achieved total success, painstakingly documented its time spent, and was paid by the NCAA, and as such its hours were reasonable." [Filing No. 99 at 5.]

Defendants' argument is somewhat scattershot. They first argue that all entries reflecting administrative and/or secretarial work should be stricken, but then cite to caselaw discussing total litigation costs (*i.e.*, not just costs related to administrative and secretarial work) and unreasonably high hourly rates. The Court will discuss Defendants' objection to the NCAA's counsel's hourly rates below, but focuses here on whether it should strike time spent on administrative or secretarial tasks. Yet again, Defendants do not point specifically to which entries they object to. Moreover, they do not even total the number of hours that they seek to be stricken. They only note that the NCAA's counsel spent more than double the 114.4 hours spent by counsel in the *Yahoo! Inc. v. Net Games, Inc.* case, which also ended with a default judgment. [Filing No. 98 at 12.] But the time spent in *Yahoo! Inc.* was for both attorneys and legal assistants, and it is not clear what type of tasks were included, so the Court is puzzled as to how that case applies to Defendants' argument that the NCAA's paralegals spent an unreasonable amount of time on administrative or secretarial

tasks. Defendants also cite to a case from this district – *Wine & Canvas Dev. LLC v. Weisser, et al.*, No. 1:11-cv-01598-TWP-MJD – in which the Court awarded $270,000 in attorneys' fees in a case that went to trial after three years of litigation. Again, though, it is not clear how this relates to Defendants' argument that administrative and/or secretarial work should be stricken.

The paralegals that worked on this matter from Loeb for the most part completed tasks appropriately performed by a paralegal rather than an administrative professional. For example, paralegals reviewed local rules regarding filing motions, prepared and redacted exhibits for briefs, reviewed the docket to determine various deadlines, checked the citations in briefs, and performed legal research. [Filing No. 93-1 at 35-37.] These are not the type of tasks that would normally be performed by an administrative assistant. *See Spegon*, 175 F.3d at 553 (stating "[t]he relevant inquiry for requested paralegal fees is 'whether the work was sufficiently complex to justify the efforts of a paralegal, as opposed to an employee at the next rung lower on the pay-scale ladder'" and finding that time spent organizing file folders and copying documents was not compensable) (quoting *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1315 (7th Cir. 1996)).

A handful of entries, however, reflect work by Loeb paralegals that appears to be truly clerical in nature, including uploading pleadings, and preparing and indexing files. Defendants have not parsed these entries out for the Court, nor suggested how much time accounts for these tasks – indeed, they did not even provide a total amount of time spent on what they view to be administrative and/or secretarial tasks. While the Court could decline to reduce the hours spent completing administrative or secretarial tasks due to Defendants' failure to provide specific

evidence, *id.* at 1313, in reviewing the Loeb paralegal entries, the Court finds it appropriate to reduce the amount of time spent by paralegals by **3.8 hours**.[3]

In sum, the Court **GRANTS IN PART** and **DENIES IN PART** the NCAA's Motion for Attorneys' Fees to the extent it finds that the time spent by Loeb attorneys and paralegals was reasonable, save for 3.8 hours of paralegal time spent on administrative and/or secretarial tasks. Defendants have not met their burden of showing otherwise – for the most part, they have not even set forth the specific entries with which they take issue. The Court will go on to consider whether the rates charged by Loeb attorneys and paralegals were reasonable.

### C. Hourly Rates

Before considering Defendants' arguments related to the hourly rates of Loeb's attorneys and paralegals, the Court sets forth those rates.

| TIMEKEEPER | HOURLY RATE[4] |
|---|---|
| Douglas Masters (Partner) | $630 |
| Edward Lee (Senior Associate) | $553.50 |
| Crystal Law (Associate) | $373.50 |
| Kyle Petersen (Associate) | $382.50 |
| Lisa Rubin (Associate) | $382.50 |
| Sarah Kunzendorf (Paralegal) | $243 |

---

[3] This amount includes complete time entries for Ms. Kunzendorf on June 27, 2017, August 11, 2017, and August 28, 2017, and partial time entries for Ms. Kunzendorf (for which the Court has estimated the amount of time spent on administrative and/or secretarial tasks) on March 10, 2017, March 13, 2017, March 14, 2017, and September 7, 2017. [*See* Filing No. 93-1 at 35-36.]

[4] Loeb provided a 10% discount for all time billed by attorneys and paralegals, so the Court uses those discounted figures in its analysis of whether the hourly rates were reasonable. [Filing No. 93-1 at 3.]

| | |
|---|---|
| Linda Pettigrew (Paralegal) | $288 |
| Barbara Fellars (Paralegal) | $297 |

Defendants argue that there is a general presumption that the relevant rates are those where the forum court is located, and that the NCAA could have used Faegre but instead used Los Angeles-based counsel who "charged an hourly rate over 2.5 times the negotiated rate charged by NCAA's local Indianapolis-based counsel…" [Filing No. 98 at 14.] Defendants also argue that it appears that only Mr. Masters has a special relationship with the NCAA, and that local counsel at Faegre, Daniel Pulliam, billed only 10% of the total hours expended on the case. [Filing No. 98 at 13-14.] Defendants note that Mr. Pulliam also reduced his rate for the NCAA, and question whether the NCAA would "refuse to pay the regular hourly rates of the other 8 attorneys, 5 paralegals, and 1 librarian, all of whom charge hourly rates higher than Mr. Pulliam's negotiated rate." [Filing No. 98 at 14 (emphasis omitted).] Defendants then jump to arguing that other courts have reduced fees significantly when entries were vague, duplicative, and/or excessive. [Filing No. 98 at 15.] They request that "Mr. Pulliam's negotiated rate of $234/hour be applied to all counsel." [Filing No. 98 at 16.] Defendants also argue in connection with Ms. Kunzendorf's work that her hourly rate of $270 is more than local counsel's hourly rate of $234. [Filing No. 98 at 11.] They note that hourly fees of $295 and $275 for two attorneys, and $115 for a paralegal, were found to be reasonable in the *Wine & Canvas* case. [Filing No. 98 at 12.]

The NCAA argues that rates charged to clients are presumptively reasonable because they represent the actual market rate for the attorney. [Filing No. 99 at 5.] The NCAA contends that Mr. Masters' and Mr. Lee's fees are reasonable because they have previous experience representing the NCAA. [Filing No. 99 at 6.] The NCAA also points to Mr. Masters' significant

experience in trademark litigation, and contends that using Mr. Lee, who also has a history representing the NCAA and has a lower hourly rate than Mr. Masters, was an efficient use of resources. [Filing No. 99 at 6.] It contends that hourly rates for the Chicago- and Los Angeles-based attorneys were reasonable because the NCAA paid them, and because there was a longstanding relationship between the NCAA and counsel. [Filing No. 99 at 7.]

       *1. Mr. Masters and Mr. Lee*

The Court first considers the hourly rates of Loeb attorneys Mr. Masters and Mr. Lee. The NCAA relies upon its long-standing relationship with both attorneys, and on its argument that their rates are typical of attorneys with similar experience in Chicago and Los Angeles, respectively. Defendants argue that the hourly rates of Mr. Masters and Mr. Lee should be cut to $234/hour – the rate that Mr. Pulliam at Faegre agreed to charge the NCAA. The Court finds that reasonable hourly rates for Mr. Masters and Mr. Lee are somewhere in between. Faegre attorney Mr. Pulliam, who does not set forth anything in his Declaration indicating that he has a past relationship with the NCAA, usually charges $445 per hour. [Filing No. 93-2 at 2.] Although he agreed to a negotiated rate in this case of $234 per hour, it appears that he performed very minimal work, which may have factored into his decision to offer a reduced rate. The Court finds his usual rate of $445 more appropriate to use in considering what comparable attorneys would charge for similar services. *See Montanez*, 755 F.3d at 554 (the relevant consideration is what "comparable attorneys charge for similar services") (quotation and citation omitted). The Court also notes that Mr. Pulliam's colleague, Amie Peele Carter, charged $550 per hour. [Filing No. 93-2 at 9-11.]

The Court finds that Mr. Pulliam's and Ms. Carter's rates are instructive in determining the appropriate market rate for Mr. Masters' and Mr. Lee's services. *Id.* ("A reasonable hourly rate is based on the local market rate for the attorney's services….The best evidence of the market rate is

the amount the attorney actually bills for similar work, but if that rate can't be determined, then the district court may rely on evidence of rates charged by similarly experienced attorneys in the community….").  The following information is relevant to the Court's analysis: (1) Mr. Pulliam graduated from law school in 2010 and appears to have been in private practice at Faegre for at least five years, www.faegrebd.com; (2) Amie Peele Carter is a partner at Faegre and appears to have been in private practice for at least twenty years, www.faegrebd.com; (3) Mr. Masters is the Managing Partner of Loeb's Chicago office, and has been in private practice for thirty years, [Filing No. 93-1 at 3]; and (4) Mr. Lee is a senior associate in Loeb's Los Angeles office and has been in private practice for about ten years, [Filing No. 93-1 at 9].

These comparisons lead the Court to several conclusions.  First, Ms. Carter's rate of $550 per hour was reasonable.  Defendants have not presented any information that would lead to the conclusion that Mr. Pulliam's usual rate of $445 per hour was unreasonable, and Ms. Carter has significantly more experience than Mr. Pulliam.  Second, the Court finds that Mr. Masters is entitled to an hourly rate higher than Ms. Carter since he has ten years more experience and a significant history representing the NCAA (which Defendants have not disputed).  This experience, which has included handling the NCAA's trademarks, was directly relevant to this case.  The Court also finds, however, that a rate of $630 is excessive for the Indianapolis market, but that a rate of $600 given Mr. Masters' extensive experience and history representing the NCAA is reasonable.  Finally, the Court finds that Mr. Lee's hourly rate of $553.50 was excessive given that he has less experience than Ms. Carter.  Balanced with his history working with the NCAA,

however, the Court finds that a rate of $500 per hour is reasonable for Mr. Lee's work.[5]

### 2. Crystal Law, Kyle Petersen, and Lisa Rubin

Crystal Law has been practicing law since 2014, Kyle Petersen has been practicing since 2015, and Lisa Rubin has been practicing since 2017. [Filing No. 93-1 at 26-31.] Their hourly rates, as set forth above, are $373.50, $382.50, and $382.50 respectively. [Filing No. 93-1 at 26-31.] Comparing these rates with Mr. Pulliam's rate, the Court finds Ms. Law's rate of $373.50 to be reasonable. She appears to have just a year less firm experience than Mr. Pulliam, whose usual rate is $445. The Court finds Mr. Petersen's and Ms. Rubin's rates to be excessive. Mr. Petersen has been practicing just three years, and Ms. Rubin just one year. The Court finds that $325 and $300, respectively, are reasonable rates for those attorneys, based on the market rates in Indianapolis.[6]

### 3. Loeb Paralegals

Defendants only complain specifically about Ms. Kunzendorf's rate of $270 per hour. [Filing No. 98 at 11.] They point to *Wine & Canvas*, in which the court awarded paralegal fees at

---

[5] Defendants rely on the *Wine & Canvas* case to argue that "comparable if not lower hourly rates" are appropriate in this case. While the court in *Wine & Canvas* approved hourly rates of $275 and $395, there is no indication that the attorneys involved had a prior relationship with their client. Also, there is no indication that the hourly rates in *Wine & Canvas* were even disputed. Moreover, Defendants provide no information whatsoever regarding the attorneys' levels of experience in that case. Simply picking one case where the attorneys' fee award was based on lower rates, without providing any explanation or context, does nothing to advance Defendants' argument.

[6] It is not clear whether Defendants object to the rates of Faegre attorneys Sarah Bowers and Melissa Orizondo. Defendants simply state that the rates of all attorneys should be reduced to Mr. Pulliam's negotiated rate of $234 per hour. Because Defendants do not address those attorneys and their rates specifically, or the rates of Faegre paralegals, the Court declines to reduce those rates. *See People Who Care*, 90 F.3d at 1313 (defendant's failure to present evidence of why a lower rate is appropriate "is essentially a concession that the attorney's billing rate is reasonable and should be awarded"); *United Central Bank v. Davenport Estate LLC,* 815 F.3d 315, 318 (7th Cir. 2016) ("perfunctory and undeveloped arguments are waived").

a rate of $115 per hour. The Court notes that the *Wine & Canvas* decision is from 2015, and that there is no indication that the parties disputed that rate. *See Wine & Canvas Development LLC v. Christopher Muylle, et al.*, Case No. 1:11-cv-01598-TWP-DKL, at dkt. 535. Additionally, the Order awarding fees does not describe the type of work the paralegal was doing.

Here, the Court has already stricken any entries that related to administrative and/or secretarial work. The Court also finds particularly significant the fact that Defendants do not object to the $270 hourly rate of the two Faegre paralegals that worked on this matter. [*See* Filing No. 93-2 at 2-3.] The Court finds a rate of $243 per hour (the rate charged for Ms. Kunzendorf's work) reasonable, and reduces the rates of Ms. Pettigrew and Ms. Fellars to $243. The NCAA has not set forth any information regarding why Ms. Pettigrew and Ms. Fellars charged a higher rate than Ms. Kunzendorf.

The Court **GRANTS IN PART** and **DENIES IN PART** the NCAA's Motion for Attorneys' Fees to the extent that it finds that the hourly rates of the Faegre and Loeb attorneys and paralegals who worked on this matter are reasonable, except for the following: (1) Mr. Masters' hourly rate is reduced to $600; (2) Mr. Lee's hourly rate is reduced to $500; (3) Mr. Petersen's hourly rate is reduced to $325; (4) Ms. Rubin's hourly rate is reduced to $300; (5) Ms. Pettigrew's hourly rate is reduced to $243; and (6) Ms. Fellars hourly rate is reduced to $243.

## IV.
### CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** the NCAA's Motion for Attorneys' Fees, [93], as discussed above. Subtracting the time the Court has excluded, and applying the reduced rates the Court has set forth, the Court finds that the NCAA is entitled to **$220,988.05** in attorneys' fees. Final judgment shall enter accordingly.

Date: 5/17/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**<u>Distribution via ECF only to all counsel of record</u>**